The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H. D. Armon presiding. Good morning, counsel. The next case we'll call is 4-22-0649 and 4-220656, the State of Thurman v. Loft Rehabilitation. Could counsel for the appellant please state your name for the record. Good morning, Your Honor. This is David Johnson for Defendant Appellant Hartland of Canton. Good morning. This is Donna Fudge on behalf of the Loft Rehabilitation and Nursing of Canton. Good morning. And could counsel for the appellate please state your name for the record. Yes, my name is Leslie Rosen. Counsel, how did you wish to proceed?  All right. Go right ahead. May it please the court. The court's role with respect to the subject arbitration agreement is very limited, and in fact restricted to just two issues. Issue number one is a contract formation question and asks, was an agreement to arbitrate formed between Hartland and Mr. Thurman's power of attorney? Issue two is, was the delegation clause contained within that arbitration agreement ever specifically challenged by the estate? I'd like to talk about contract formation first. We all know that a contract is formed by the elements of offer, acceptance, and consideration. We have the offer here in the form of the written contract, and we have consideration because the promises were mutual to waive the right to a jury trial. So the third ingredient of acceptance, which is sometimes referred to as mutual assent, the most common way to establish mutual assent is by one party to affix their signature to the contract. And once a party does so, that signature is charging them with the knowledge of and the assent to the terms within that contract. And mutual assent, therefore, is an objective standard. Here it is. Counsel, excuse me. Good morning. You represent the loft. The loft was not operating the nursing home at the time. The time Chester was admitted to the nursing home. Correct. True. And the loft did not sign the arbitration agreement either. Did it. True. Did the loft need to introduce this operating agreement to the or show it to the trial court here? The one that was dated April 2018. I mean, how do we know the scope of the assignment and indeed whether it does include this arbitration agreement? The answer to your question is no, that document did not have to be introduced into evidence. And the answer to your question starts and ends with the arbitration agreement itself. And you look at the written words to determine the intent of the parties to the contract. And if you look at page one of the arbitration agreement in the definition of parties there, you will find your answer because it states the intent of the parties. And I'll quote it, quote, the parties intend to allow any person alleged to be liable for any actions or inactions, dot, dot, dot, related to any care provided to the patient to demand arbitration pursuant to this agreement. So those written words show the intent of the parties to broadly expand this arbitration agreement. And that definition would include my client, the loft. But the arbitration agreement itself really has nothing to do with operations of the nursing home, does it? Oh, it does. Yes. And it encompasses any allegations that there is any action or inaction improper in the care to the patient in this case, which would be Mr. Thurman. I'd also like to point out, we cannot forget the power of the delegation clause here. So because there's a delegation clause in this arbitration agreement that delegates all questions of scope applicability and interpretation away from this court and hands them solely to the jurisdiction of the arbitrator. With all due respect, the questions that your honor just raised are questions of scope applicability and interpretation that have been delegated and should be left solely to the arbitrator to decide. You're welcome. So it is undisputed that Shirley signed as the power of attorney on the contract, and once she signed her name, the only way that the law would allow there to be a discussion of whether there was a lack of mutual assent would be if surely lacked mental capacity, which we know she didn't. If surely lacked the legal authority to bind her husband, which that's not in dispute, or if surely was forced to sign a course to sign under duress. So let's talk quickly about duress. I have a question regarding duress. Yes, it seems that the trial court here, possibly interpreted assent as duress, but duress does not occur under the circumstances does it I mean duress means when someone is induced by threat or wrongful act to make a contract under circumstances where there isn't any free will. Is there any evidence of that here. There is no evidence of a threat here your honor there is no evidence of a lack of free will here, and you are correct the trial court never even use the word duress the trial court never found that surely lacked free will. At most, Council didn't the trial court say there was distress. That is correct the trial court word distress and the word distress is distinct and very different from the word duress. Okay, explain that. Okay, because what the other justice just mentioned is that duress would require a threat or a coordinate in this case by Mary Andrews at the signing table against surely, meaning that surely would have been forced or threatened to sign this agreement that would create duress. That's not what we have here. And there's no evidence of that here. And importantly, the estate never even raised the issue of duress at the trial court level so that issue has been waived. And secondly, the trial court never found duress. Again, the most that the trial court said was that surely had distress, and the court found that that caused her to lack the mutual assent because the court said she was quote, not able to comprehend that signing the arbitration agreement was a voluntary end quote. But again, that is not duress. That is a distress situation which at most would be a factor, one factor to consider in the totality of the circumstances at the signing in a procedural so unconscionability type of analysis, but that is also delegated. Are you saying distress then is an element of duress. No, no. Okay. It is not and I apologize if I misled you know, I think at most distress would be a factor to consider in a procedural unconscionability analysis when you're looking at the totality of the circumstances at the signing table. But here, number one, procedural unconscionability has been delegated to the arbitrator. So it was air for the trial court to even get involved in and try to haggle with and reach a decision as to the totality of those circumstances. And even if, even if unconscionability had not been delegated to the arbitrator, if you look at the facts and the record, surely had a meaningful choice. Surely was able to comprehend that this contract was voluntary. And how do we know that? Number one, it's undisputed. She was mentally competent to she could see read here and understand the written and verbal English explanations that were being given to her. All she needed to do was open her eyes and look at the title. I'm holding it in front of you. I don't know if you can see it. The title of the arbitration agreement, which is three simple words in 40 point huge font bolded in all cap that say, quote, voluntary arbitration agreement. Those are three words that the estate itself at docket 137 page to conceded were quote abundantly clear end quote that this was a quote voluntary agreement not required for admission and. But she had in front of her several documents that she had to sign in a very short period of time, did she not. And I think, certainly in her testimony was that she was terribly upset by putting her husband in a nursing home that day. And so that she wasn't able to focus. She didn't have her children with her. She didn't consult an attorney. So how does that all figure in here to the fact that she did sign this and that she said it was voluntary, given the circumstances. Number one, again, procedural unconscionability is what you're raising. It's been delegated to the arbitrator, even if it had not been any, any hurry that she felt by surely was self imposed on her on her own self. She was in a hurry because she wanted to get down the hallway to see her husband, who was, by the way, already in his room. You know, the fact that she didn't have a lawyer there, her children there, the law doesn't care about that fact when it comes to contract formation. So, yes, and there are many situations where we sign lots of documents at house or other important sales, where we sign multiple documents at the closing table or the signing table. So that is not a factor that creates an unconscionable situation. So here again, arbitration agreements, let's keep in mind. It's the equal treatment rule. An arbitration agreement must be treated equally with all other kinds of contracts that we would look at in the state of Illinois. And we cannot create some sort of extra hurdle or extra requirement just because it's an arbitration agreement, because the FAA would preempt that type of extra hurdle as being hostile toward the goals of the FAA. All right, counsel, your time is up, Mr. Johnson. Good morning, your honors, fellow counsel, and may it please the court. Your honors, determining this case requires a rather simple, straightforward analysis, as my fellow counsel has already alluded to. The voluntary arbitration agreement at issue in this case was a valid contract between Heartland of Canton and Shirley Thurman. And the trial judge should have dismissed the case pursuant to that valid arbitration agreement. I'd like to note at the onset here that Illinois has a strong public policy in favor of enforcing arbitration agreements. Arbitration agreements, as my counsel had alluded to earlier, are contracts under Illinois law. So the primary question here for the court is whether the arbitration agreement itself was a valid contract. And Heartland's position is that it was. In this case, plaintiff attempts to argue that there was no contract formed between the two parties by stating three things. One, that no mutual assent existed during the formation of the contract. Two, that the agreement itself was procedurally unconscionable. And three, that the agreement itself was substantially unconscionable, something that the trial court did not address particularly. First and foremost, mutual assent certainly existed during the formation of the contract. Primarily because Shirley Thurman, who had the full authority of the health care power of attorney and the power of attorney for property, signed the contract. It's axiomatic in Illinois. It's been long held that signing the contract means that you assent to the terms of the contract. A party who has assented to the terms of a contract by signing the agreement is charged with knowledge of those terms in the contract. There is no dispute in this case that Shirley Thurman signed the contract. Her name and signature is on the agreement itself, and she testified to the same. Plaintiff's argument against mutual assent thus hinges on testimony from Shirley that she didn't understand the document, that she felt wronged throughout the process, etc. However, most of those questions were elicited by leading questions from counsel at the end of the deposition. And generally speaking, she testified that she didn't specifically recall the circumstances around the reviewing of the contract, reviewing of the arbitration agreement. The trial court should have disregarded these later statements as parole evidence. The agreement, as written, speaks for itself. Even if these later statements were to be considered, they're just retrospective, subjective understandings three years after she signed the contract. When you say parole evidence, are we not to look at the conduct surrounding the signing of the contract? And would this come within that framework of conduct? That is, how the signatures took place, what her mandate was at the time? Yes, Justice. Our position would be that the signature on the contract would indicate her assent to the terms. But if we were to look at the conduct and the extrinsic evidence of the parole evidence surrounding the formation of the contract, such as her signing and when she signed it and how she signed it, then I think the court must also consider Mary Andrews' testimony as well, where she described that at no point in time did Shirley appear rushed to her, that they took their time to review the agreement before signing it, that she made sure that she understood it before she signed it, and she made sure that Shirley was aware that there was a provision in the contract that gave her the opportunity to have an attorney read it before she signed it, and that she had 30 days to cancel it after signing it. Well, the court didn't put much stock in Mary Andrews' testimony at the deposition, though, did he? No, and it's interesting, Your Honor, he seemed to focus on some language of vagueness, something to that effect, after Mary had been asked the same question four or five times. She had some hesitation regarding what the word distress meant, is that correct? Right, and it's my recollection from the deposition testimony that she had good answers for that for the first three or four times that she was asked it, and perhaps she felt pressured in answering it a different way during the course of the deposition, but it was her recollection initially, upon first being questioned of it, that she did not think that Shirley was in distress. Counsel, what is our standard of review? I would argue, Judge, that it's de novo, and in this case, there was no evidentiary hearing held. No witnesses were called. There was no factual findings made. There was one oral argument session for about 90 minutes, interpreting whether or not a contract existed as a matter of law that's reviewed de novo in Illinois. So your argument is there were no factual decisions made by the trial court? Yeah, I would argue that there was no evidentiary hearing held where he made specific findings of fact. Well, let me ask you this. If the trial court did make specific findings of fact, those would have been made based upon the court's reading of depositions, correct? As those were the only forms of testimony in this case, that would be my guess, but it's our position that he did not make those factual findings, and had there been an actual evidentiary hearing, there would have been. No, I don't know. What do you mean it'd be your guess? What else would have the court made factual findings on other than the reading of the depositions? In the scenario, Judge, that he would have made factual findings, we would have requested to have additional evidence or witnesses admitted into evidence to be able to testify to those facts. But if the deposition transcripts in question in this case are the only factual findings, I still feel strongly that they support Hartland's position in this case. Excuse me, following up on Justice Turner's questions, what about the court's, apparently to me, findings of fact that Shirley wasn't able to comprehend the arbitration agreement was voluntary? Secondly, that she thought she was required to sign every document presented to her? And thirdly, Shirley was so distressed that she was incapable of rendering assent.  Yeah, if we were to interpret those as factual findings, I still think that the court misinterpreted both the applicable law and misread the actual evidence before him. And to take those in turn, I think that Shirley understood what she was signing was voluntary. If you look at the actual agreement itself, it repeats the word voluntary in bold-emphasized font repeatedly. At her deposition three years later, after she signed the agreement, she acknowledged that it said voluntary. So she could understand the terms even in the course of the deposition three years later. Mary Andrews testified that she made sure that Shirley understood what the purpose of the agreement was and that she had certain rights and obligations under that agreement. As to the rest of the factual findings, the level of distress, I think there is some question as to whether she was under distress, but she gave conflicting testimony on that. And the only solid testimony we have is Mary Andrews saying it was her perception that she was not under distress. But I would just bring to the court's attention that, much like my fellow counsel mentioned, a certain level of distress is not necessarily going to speak against the formation of a contract. Individuals sign contracts under some level of distress every single day. For example, I think the best example is informed consent documents that individuals sign at hospitals for certain procedures that a loved one may have to undergo. I would imagine that those are certainly signed under certain levels of distress, and I don't think that there would be any doubt that those are valid contracts. Counsel, can I ask a question? Absolutely. Wouldn't we look at the distinction between duress and distress in this light? Since we're looking for something which might otherwise invalidate what appears to be a valid contract, wouldn't the biggest distinction be that duress is something that's caused by an external source, and distress is something internal or personal to the signer? So it's almost impossible to determine whether someone is truly in distress or not. They just say they are, and then you have to look at all the other circumstances to see whether that's a realistic distress. Maybe they're just a hyper-nervous individual. Alternatively, duress is something that comes from an external source which should be subject to evaluation and review and consideration, and there should be some facts. For example, they have a bunch of people standing around her and they're telling her, look, you've got to get this signed right now. Those are all external factors which could constitute duress and thereby invalidate the signing of a contract, whereas distress is going to be something that's far more difficult to assess from any outward observer because that's just what the signer is saying. Yes, Judge, I think that your analysis is perfect, and I think that it's important to understand that duress has never been raised as an argument in this case by any of the parties. The only mention of it in the briefs here before your court is to state that the trial court only stated distress, not duress. I think you're right. There's no evidence of any of these external factors trying to induce Shirley into signing this contract whatsoever. In fact, I think Mary Andrews testified several times to the contrary. She never received any bonuses or anything to that effect for getting her to sign the contract, and as to what level of distress Shirley may or may not have been under, certainly it doesn't speak against the formation of a contract. So I think that the trial judge took some liberties in finding that she was in distress based on the evidence before him, and certainly duress not only has not been brought up as an argument in this case, but certainly there is no evidence in the case whatsoever to even provide any evidence for it. All right. Thank you, counsel. Your time is up. You will be given an opportunity in rebuttal. Do you already know how your time is divided up for rebuttal? I think that we've both split it. Okay. Counsel for the Appalachian. Good morning, Your Honors. Please support Leslie Rosen here. I'd like to start with the standard of review. Just briefly, there is an abuse of discretion as the standard of review when there are factual findings. As Judge Justice Zenoff said, there were factual findings here. Moreover, the law provides, it says, an abrogast versus Chicago Cubs. The court said the existence of a contract, its terms and the parties' intents are questions of fact to be determined by the trier of fact. And it also says in that case, in paragraph 20, that whether the parties have mutually assented to the terms of contract is a question of fact. Counsel, let me interrupt you there. Does it matter that the so-called findings of fact were based upon a reading of the two depositions? Well, that's a great question. I'm sorry. Because I think it's like a summary judgment motion. Nobody asked for an evidentiary hearing. This is like summary judgment. So I don't think in this case it does. But, Counsel, if it's like summary judgment, and I kind of think it is, our standard of review would be de novo. Yes, but it's kind of like, yes, because there is no evidentiary. But the question here is whether there's mutual assent and whatever it's based on, it's a question of fact. So that leads you back to the abuse of discretion. I do think there is a de novo component here if you go beyond the formation of the contract to whether it was enforceable. Because the case law says that enforceability of a contract is de novo. And so there could be, I just thought of this today, it could be, depending on how you rule, partially abuse of discretion and partially de novo. Because the enforceability being de novo is in the new case. I cited Kalinske, Kalinske, Kalinske, Kalinske, Kalinske says that it's de novo as to enforceability. So that's as far as I'll go. But I do think because it's similar to summary judgment, but I don't think so. Anyway. Counsel, good morning. Enforceability is not before this court today, however. That is pursuant to the arbitration agreement is delegated to the arbitrator. And the trial court even formulated the issue of whether or not there was a contract formed here. Isn't that the issue before this court today to review that? The issue before this court is whether there was contract form. However, there is some talk about unconscionability  And I think the trial court's opinion could have been a little bit better on this. But he does find on formation, but there is talk of unconscionability in that as a matter of finding a fact, the judge found that she didn't understand that she was very distressed. She'd been married to Chester for 56 years. This must have been one of the worst days of her life. And they crafted the whole procedure for her signing it after. And as Mr. Johnson said, it's much like a lot of contracts were under distress. It's like when you go to a hospital and you sign a consent form, you may be under distress. But in this case, it's like they gave her the contract to sign after they had given her the anesthesia. She had already had to put her husband in the room and they could have given her the documents before. They could have done many things. Yes, but counsel, this is a subjective test that the trial court used rather than an objective approach. Do you disagree with opposing counsel that we're to use an objective, the trial courts to use an objective test and that's what we're to look at? The rule is clearly an objective test, but I believe he used one in this case. Of course, it's subjective, whether she was in distress, Justice Darman gave a great distinction between distress and duress, but she testified, nobody explained it to her. If you look at the Kalisinski decision, which is more on enforceability than on formation, the two just seem to go together, unfortunately. It's not the cleanest thing. It's an objective standard on the first one, but Kalisinski- If Kalisinski is relevant here, you're saying it's relevant on enforceability, but our arbitration agreement tells us that that subject is one for the arbitrator, not for the trial court or this court. I disagree with that. I just read the opinion this morning and while counsel says that, Ms. Fudge in particular, but in fact, it was the very same matter and the court said in Kalisinski, the terms of the nursing- No, there was no consideration and it wasn't an absolute, the nursing home, it was unconscionable. The agreement was even more one-sided in that case and did delegate also. The trial court, I'm sorry, the appellate court looked at substantive unconscionability in Kalisinski. Their agreement contained an express waiver of a resident's right to recover attorney's fees under the Illinois Nursing Home Care Act. Here, how do we have anything similar to that? Well, here, it says that the fees will be paid by the parties unless, unless the arbitrator decides. It starts out with a barring and then it modifies in some. That is one matter. I believe it's a partial barring. It's depriving the party of its right to the fees under the Nursing Home Act. This arbitration agreement also ostensibly puts wrongful death claims into arbitration and that's not okay under Illinois law. The fact that it says it's not dispositive, the court can look at unconscionability and we're not talking about procedural. We're talking about substantive here. So, assuming the actual assent found here, doesn't the delegation clause require that arbitration and these other issues you're discussing, counsel, that are raised in this appeal belong to the arbitrator? I don't think so. What authority, is the authority you're citing for that? Okay. Yeah, yeah. So, essentially what Mr. Johnson is saying and Ms. Fudge to a degree is that there's an irrebuttable presumption that if you sign this agreement that's got it, then there's nothing to talk about here about mutual assent. Counsel, aren't they saying that there's a rebuttable presumption but in order to rebut it, you have to show some sort of external evidence of something which would be similar to duress coming from some outside source as opposed to someone just simply saying they're under distress. No, that's not what Mr. That's not what Mr. Johnson is saying. Mr. Johnson is saying there's no right to parole evidence, there's no right to anything. They both said she signed it, that is it. They don't say she signed it, that's it unless he finds arrest. I didn't see that in their briefs. They're saying no, you couldn't understand it. They say it doesn't matter if she understood it, that's a subjective thing and subjective doesn't count here. But in fact, the law is not so harsh. Well, we know there's a first district case, the Adams case, A.D.M. A.D.A.M. E.S. from twenty twenty first district. Justice Codds authored it. Justice Paczynski and Justice Smith also agreed that the signing of a contract indicates assent to its terms. So get past that. Well, of course it does, but it can't in every case. I mean, you can't you can't just say that's generally it says generally it doesn't say always. I mean, it's a it's a factor. Even counsel talked about factors that you would have that even I think it was Ms. Fudge conceded that it was a factor. And do you only need it to open her eyes? She only needed to open her eyes is what Ms. Fudge said. Do you disagree with Justice DeArmond that the factor needs to be an outside factor rather than her subjective state of mind or emotional state? I I think that they both come into play. I understand. But I think there was duress and distress. And I think I disagree with the other justice and that you can you can consider whether there was distress. You can consider the fact that this is a woman who had extraordinarily limited experience with contracts. She had three contracts in her life. One was a lease. One was a home sale. And the other was a bank loan. Her kids had been with her for two of those experiences. Those had been read to her. She worked at a department store. She had this was her 56 years. She had been married to this man and had to put him in a nursing home because of his dementia. It's horrible. She was horrible. And they decided yes. Mary said, well, she could have signed it in his room. She's the one who decided to come to my office instead of doing it there. But they still crafted it at the very end of the whole admissions process. And then beyond that, it was it wasn't it wasn't hidden, but it was paragraphs. But is it 15 out of 17 paragraphs that that waves this? It's not buried in small print and it's not smaller. It's not like in many of the cases that I've been involved with involving hospital consent forms that says that apparent agency cases. It's not it's not as bad as some of those cases, but it's it's a terrible situation. She's in a room just this person. This person doesn't even understand what an arbitration agreement does. That's the problem. And she doesn't remember. And are you saying and I think opposing counsel, Mr. Johnson talked about this, that if someone signs a consent in a hospital before surgery and they're so nervous about it or someone who has a health care power of attorney signs for them or what about real estate closings under difficult circumstances signing a mortgage? Are we to say that persons in that those emotional states are incapable of entering into a contract? No, I'm not asking you to do that. But first of all, in the in the hospital setting in the hospital setting those cases. I can Williams is a fifth district case. A parent agency is a question of fact. And on those cases, they look at every factor. You can't say I just didn't understand it. I mean, even if you didn't speak English, but but those cases are factually and they're very different and a mortgage and a sale of a house. There's typically a lawyer present. You're not there alone. And the lawyer is telling you what to sign here. She's alone in a room with the nursing home. And so it's a very different situation. It's a factor that she signed it. It's a significant factor, but it's not the only factor. That's my position in the trial. Judge looking at it felt that she couldn't have understood it. And he said that was he applied a subjective test saying that was the only factor. Did he not? And I'm sorry, I don't understand the trial court not use this as the only factor to decide there was no mutual assent. That is the only lack of education beyond high school. No. What he said was under the totality of the circumstances. It is clear that surely was not able to comprehend that signing the arbitration agreement was voluntary. It is abundantly clear that she thought she was required to sign every document in order to have her husband admitted to the nursing home. That's at page 11 of his order. And that's what he found under the totality of the circumstances where I would never say that that it's not her right to consider the fact that she signed it. We didn't argue that she lacked capacity. That's not in this case. But there are times when signing something is not the be-all and end-all. And this is one of those times. It would be grossly unfair otherwise. I mean, they created the very worst possible situation for signing the agreement. After the whole admission has been done, after the guy is in his bed, they give her all these documents to sign. You yourself pointed out at the very beginning when you were questioning Ms. Fudge. Weren't there lots of documents? Didn't she have to sign them all?  she didn't. Even it was confusing. All the documents in the beginning says, these are the documents you have to sign. Boom, boom, boom. Voluntary agreement, if elected. How is somebody who is in such distress supposed to understand that? I can't even understand it. Yes, but counsel, if we think about it, isn't the overwhelming situation the same no matter what? The fact wouldn't change that she had to have her husband placed in a nursing home or she made the choice of whatever order. In whatever order we're talking about, three documents, four documents possibly. Well, not according to my reading of the record, but we certainly didn't have more. How many documents do you believe there were? I thought there were five. I'm sorry. One was a Medicare disclosure. She had to sign receipts. Right. Okay. But the overwhelming situation wouldn't change. So you're saying that somehow the nursing home should have done this in a different order at a different time and that would have changed the circumstance of her emotional distress? I don't know what would have changed her emotional distress. All I know is that they created a situation where it was the perfect storm. It was the worst possible situation to do this. Maybe they should have mailed them to her. Maybe when they first came to see this they should have talked about it. Maybe they should just get rid of these arbitration agreements altogether. I'm just saying in this case they couldn't have done a worse job. The woman who was reading didn't understand what arbitration meant. You can have a lawyer or you can withdraw this in 30 days. I don't think that's a fair equal playing field. I would like to move on if I can. The facts are what they are. You understand them perfectly well. Everybody understands what's happening here. If I could move on to the lofts not having any standing to assert third party beneficiaries  Illinois. Would you agree that defining parties would cover their standing? I absolutely disagree. I think that's a ludicrous problem. The law on third party beneficiaries is settled. Carlson versus rehab institute talks about it. You have to be named. There are two types of third party beneficiaries in Illinois. Incidental have no standing to dispute anything. They have to be named and the circumstances surrounding it can be considered but you must be expressly named in  statute. They're not named. They're not an affiliate. Ms. Fudge's argument would allow anybody who wants to be any person. It's too broad. I don't think there's anything to that. I just want to point out there will be a trial in this case no matter what happens here because they can see that the wrongful death claims are not covered by the agreement even though they are covered in the agreement defendants can see they're not covered. To me it seems that it's pretty clear that since there will be a trial, there will be the wrongful death claims and the circuit court has no right to arbitration and there's no reason for arbitration with heartland because there is no mutual assent. That's  have to say. Thank you. A contract here specifically in agreement to arbitrate more specifically a two sentence delegation clause was formed. There was an offer, there was mutual consideration and there was acceptance meaning mutual assent. It's an objective test and it  here by Shirley Thurman's signature. There is a lack of any record evidence to unravel that mutual assent because it's undisputed that Shirley had mental capacity and legal authority to bind her husband and was never even argued by the estate nor is there any evidence in this record that Mary Andrews threatened or did anything external to coerce Shirley into signing this agreement. In fact, if you look at docket 189, pages 2, 3, 5, and 7, the estate admitted in five different places that Mary Andrews explained the arbitration agreement to Shirley. And even if this woman was under some distress on move-in day, she had 30 days thereafter, almost 700 hours after the dust settled and things calmed down, to come and look at the contract she signed and then she had 100% meaningful choice, total bargaining power, total control, to walk away from it and simply revoke it. She didn't do that, therefore, the delegation clause was formed, it stands, it's valid, it must be enforced by this court under Henry Schein and Rent-A-Center decisions, and therefore, the trial court erred in delving into procedural unconscionability and totality of circumstance factors. Thank you. Does the loft have to be named as opposing counsel indicated to  beneficiary counsel? I do not believe so. Again, the intent of the parties to the contract is what controls. I read you the   believe that the scope of applicability or the scope of who is bound to that arbitration agreement or even what claims are bound to that arbitration agreement has been delegated to the arbitrator. Thank you. Thank you, counsel. Mr. Johnson? Your Honor, I wanted to conclude with two different points. Number one, the plaintiff in the trial court have repeatedly argued that Shirley was not capable of understanding or entering into the contract. Chester thought she was capable of doing so and named her as his power of attorney for property giving her broad authority over all of his legal affairs including entering into contract. The second thing I would like to bring to the court's attention is that the facts of the Mason case are almost perfectly analogous to the case before us. Here, like there, the agreement was in broad language and clearly informed both of the signing parties that a jury trial was being waived. In this case, like the Mason case, there's testimony from a facility representative who would have gone over the documents to allow Shirley to read them and not be rushed to sign. In this case, Shirley could have chosen not to sign the agreement. The agreement is also not one-sided. There's no imbalance in the obligations and rights imposed by this contract. The language of the agreement is clear that all disputes between the parties be resolved in a fair way. To some, this is a valid contract. There's mutual assent to the terms between Shirley Thurman and Hartland of Canton. We believe the trial court erred in denying our motion to   agreement. Thank you.